## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARVER BENSON, et al. | : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | No.:   09-cv-3194 |
| | : | |
| GIANT FOOD STORES, LLC, et al. | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

**SITARSKI, M.J.**                                                      **December 22, 2011**

Presently before the Court is Defendant's Motion For Attorney Fees and Expenses (Doc.

No. 93), Plaintiffs' Answer in Opposition (Doc. No. 94), Defendant's Reply (Doc. No. 100), and

supplemental briefing by both parties (Doc. Nos. 124, 126, 127).

## I.      BACKGROUND

The facts and procedural history of this case are well known to the parties and to this

Court.  *See e.g.*, *Benson v. Giant Food Stores, LLC, et al.*, No. 09-3194, 2011 WL 722256

(E.D.Pa. Feb. 28, 2011) (Doc. No. 120).  Thus, I will provide only a brief summary of the

background relevant to the present motion.  Additional relevant facts are incorporated into the

discussion section below.

On July 9, 2009, Plaintiffs brought this civil action alleging state law personal injury

claims.  (Doc. No. 1).  Plaintiffs alleged that Carver Benson suffered injuries from ingesting a

foreign object in food purchased at a Giant Food Store.  (Doc. No. 1, ¶¶ 23-42).  Additionally,

Plaintiff Annie Benson alleged loss of consortium as a result of her husband's injuries.  (Doc.

No. 1,¶¶ 42-49).  On October 6, 2009, the Honorable Juan R. Sánchez referred the case to me for

settlement purposes only, and on November 12, 2009, counsel appeared for a settlement

conference, which was ultimately unsuccessful.  (Doc. Nos. 4, 9).  On April 6, 2010, the parties

consented to the exercise of jurisdiction by a United States Magistrate Judge, and the matter was

referred to me for trial and disposition.  (Doc. No. 30).  On April 8, 2010, I granted Plaintiffs'

unopposed Motion to Remand for Arbitration.  (Doc. Nos. 32, 33).  The arbitrators found in

favor of Plaintiffs and awarded money damages; Defendant appealed this award, and requested a

trial de novo.  (Doc. Nos. 37, 38).

   The parties proceeded to jury trial on Plaintiffs' claims of negligence and loss of

consortium.  On the first day of trial, Defendant stipulated to liability, leaving only causation and

damages as contested issues.  Ultimately, the jury found that Defendant's negligence was the

"factual cause" of some harm to Plaintiffs; however, the jury, awarded $0.00 in damages as

Carver Benson's injuries.  (Doc. No. 80).  Likewise, the jury award $0.00 in damages on Annie

Benson's loss of consortium claim.  (Doc. No. 80).  On August 18, 2010, this Court entered

judgment, and the matter was marked closed.  (Doc. Nos. 81, 82).

   Thereafter, on October 13, 2010, Defendant filed a Motion for Attorney Fees and

Expenses ("Motion for Fees").  (Doc. No. 93).  Plaintiffs filed an Answer in Opposition, and

Defendant filed a Reply.  (Doc. Nos. 94, 100).  On December 10, 2010, the Court denied

Defendant's Motion for Fees, concluding that the motion was not timely filed.  (Doc. No. 106).

On December 17, 2010, Defendant filed a Motion for Reconsideration, which the Court granted

on February 28, 2010.  (Doc. Nos. 108, 122).  Thus, Defendant's Motion for Fees is now before

the Court.  The Court heard oral argument on March 21, 2011.  Supplemental briefs were filed on

March 18, 2011, and March 25, 2011.  (Doc. Nos. 124, 126, 127).

## II.     DISCUSSION

### A.     Summary of the Parties' Motions for Attorney Fees and Expenses.

On October 13, 2010, Defendant filed the instant Motion for Attorney Fees and Expenses pursuant to Federal Rule of Civil Procedure 54(d)(2)(B), 28 U.S.C.A. Section 1927, and Local Rule of Civil Procedure 83.6.1.  Defendant requests an award of $78,785.00 in fees and $6,360.80 in expenses, incurred beginning with receipt of the Complaint through and including trial and post-trial motions.  (Doc. No. 93, Ex. Q) (Doc. Nos. 124, 127).  In support of this request, Defendant presented the Court with an unedited, whole bill for attorney fees and expenses.  While Defendant conceded that the litigation was not filed in bad faith and that the case originally had some settlement value, counsel did not parse out the fees and expenses relating to the claims that Defendant considered frivolous.  Instead, counsel argues that the litigation was multiplied at every stage of the proceedings following the Answer, and that Defendant is entitled to recover all fees and expenses after that point in time.  Argument Transcript, 03/21/2011, p. 50-64.

Defendant argues that sanctions are appropriate in this case because Plaintiffs' counsel unreasonably and vexatiously pursued three meritless arguments in support of Mr. Benson's claim for injury and damages.[1]  Specifically, Defendant alleges that Plaintiffs' counsel unreasonably argued that:  (1) "Dr. Jeffrey E. Sootin's hernia operation and treatment of Mr. Benson was related to the ingestion of the screw;" (2) "Mr. Benson suffered internal bleeding and

---

[1]  Defendant's motion does not focus on Annie Benson's loss of consortium claim.

rectal bleeding as a result of the ingestion of the screw;" and (3) "Plaintiffs' financial hardship was a direct result of the ingestion of the screw." (Doc. No. 93, ¶ 2). Defendant alleges that counsel pursued these meritless arguments throughout the litigation even though counsel knew or should have known that each position was unsupported by the facts. Defendant alleges that counsel advanced these arguments in discovery and at arbitration, and failed to properly investigate and/or disclose facts relevant to these issues. Finally, Defendant alleges that counsel pursued the meritless arguments in bad faith and/or by intentional misconduct for "the improper purpose of unjustifiably, grossly inflating Plaintiffs' damages claims." (Doc. No. 93, p. 26). Thus, Defendant contends that counsel's unreasonable and vexatious conduct entitles Defendant to attorney fees and expenses pursuant to 28 U.S.C.A. Section 1927 and Local Rule of Civil Procedure 83.6.1.

In response, Plaintiffs generally argue that statements made during settlement and arbitration are not admissible for purposes of Defendant's motion. (Doc. No. 126, p. 10-14). As discussed more fully below, the written statements at issue are found in Plaintiffs' settlement brochure and pertain to the first and second allegedly meritless arguments (i.e., the physical injuries Mr. Benson claimed to suffer through ingestion of the screw). Plaintiffs presented similar testimony at arbitration in relation to these issues.

In opposing Defendant's motion, Plaintiffs respond specifically to each of the three arguments. Regarding the first, Plaintiffs contend that they made no legal claim in their Complaint or at arbitration that the hernia surgery performed by Dr. Sootin was related to ingestion of the screw. (Doc. No. 126, p. 3-6). Plaintiffs note that Mr. Benson's belief concerning the hernia surgery operation was never presented at trial. As to the second matter,

4

Plaintiffs argue that the testimony at trial supported their position that the passage of the screw excoriated a preexisting hemorrhoidal condition, causing bleeding.  (Doc. No. 94, p. 5) (Doc. No. 126, p. 6-8).  As to the third matter, Plaintiffs argue that the evidence supports their position that Plaintiffs' financial hardship was a direct result of the ingestion of the screw.   (Doc. No. 126, p. 8-10).  Finally, Plaintiffs argue that counsel acted in good faith at all times.

In addition to the attorney fees and costs associated with work performed prior to final judgment, Defendant seeks sanctions concerning the post-trial motions filed by Plaintiffs. Defendant asserts that Plaintiffs' Motion for a New Trial, Plaintiffs' Motion for Reconsideration, and Plaintiffs' request for Rule 11 sanctions against Defendant were improper, and warrant an award of fees and costs.  (Doc. No. 93, p. 22, 25) (Doc. No. 100).[2]  On the other side, Plaintiffs request that sanctions be entered against Defendant.  Plaintiffs generally argue that Defendant should be sanctioned for filing the Motion for Attorney Fees because Defendant presented no credible argument in support of this motion, and Plaintiffs' claims at trial were supported by the evidence.  (Doc. No. 94, p. 6-8) (Doc. No. 126).

**B.     Legal Standard Relevant to the Requests for Attorney Fees.**

Defendant's request for attorney's fees is governed by 28 U.S.C. Section 1927, which provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

---

[2]  Defendant presents no specific argument concerning an award of fees in relation to Plaintiffs' Motion for a New Trial; however, the Motion for Reconsideration and request for Rule 11 sanctions are specifically briefed.  (Doc. No. 93, p. 22, 25) (Doc. No. 100).

To violate § 1927, an attorney must be found to have: "(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct." *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 101 (3d Cir. 2008); *LaSalle National Bank v. First Connecticut Holding Group, L.L.C. XXIII*, 287 F.3d 279, 288 (3d Cir. 2002) (*citing In re Prudential Ins.*, 278 F.3d 175, 188 (3d Cir. 2002)). A party seeking an award of attorney's fees under §1927 bears a heavy burden. "Courts should exercise [discretion to award §1927 sanctions] only in instances of a serious and studied disregard for the orderly process of justice." *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir. 1986) (citations omitted). The Third Circuit has held that "'sanctions may not be imposed under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal.'" *Grider v. Keystone Health Plan Central, Inc*., 580 F.3d 119, 142 (3d Cir. 2009) (quoting *LaSalle*, 287 F.3d at 289). The attorney's conduct "must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." *Baker Industr. Inc. v. Cerberus, Ltd.*, 764 F.2d 204, 208 (3d Cir. 1985) (citation omitted).

"A district court's finding of bad faith or the absence of bad faith in a particular case is a factual determination and may be reversed only if it is clearly erroneous." *Ford*, 790 F.2d at 347 (*citing Baker*, 764 F.2d at 210). Further, "once a finding of bad faith has been made, the appropriateness of assessing attorneys' fees against counsel under section 1927 is a matter for the district court's discretion." *Id*. In exercising its discretion, the court "must balance the equities between the parties and may award attorney's fees whenever overriding considerations indicate the need for such a recovery." *Id*. In essence, the court is free, upon determining the existence of

6

bad faith, to either grant or deny the imposition of fees and expenses.  Additionally, a decision to

deny fees may be based on a finding that both parties acted in bad faith, as in *Perichak v.*

*International Union of Elec. Radio*, 715 F.2d 78, 80 n. 5 (3d Cir. 1983).

> Eastern District Local Rule 83.6.1, "Expedition of Court Business," provides:

>> **(b)** No attorney shall, with just cause, fail to appear when that
>> attorney's case is before the court on a call, motion, pretrial or trial,
>> or shall present to the court vexatious motions or vexatious
>> opposition to motions or shall fail to prepare for presentation to the
>> court, or shall otherwise so multiply the proceedings in a case as to
>> increase unreasonably and vexatiously the costs thereof.
>> **(c)** Any attorney who fails to comply with . . . (b) may be
>> disciplined as the court shall deem just.

Thus, Eastern District Local Rule 83.6.1 provides language identical to that of §1927 in that it

focuses on the "vexatious" and "unreasonable" nature of an attorney's behavior.  Local Rule

83.6.1 is somewhat broader in scope than Section 1927 "because it takes into consideration the

Court's inherent power to sanction . . . Nonetheless, the Third Circuit has explained that

sanctions imposed pursuant to the Court's inherent power also require a finding of bad faith in

most instances."  *Cintron Beverage Group, LLC v. Depersia*, 2008 WL 1734184, at *2 (E.D.Pa.

2008) (citing *In re Prudential Ins. Co.*, 278 F.3d at 181).

> Should this court choose to impose sanctions pursuant to §1927 and Local Rule 83.6.1,

the sanction order should "relate each sanction to some aspect of [the] conduct and explain how

that conduct comes within the authority" relied on to impose it.  *Grider*, 580 F.3d at 143 (*quoting*

*Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995)).  The sanctions available under §1927 are

limited to those excess costs and expenses incurred "because of such conduct."  28 U.S.C.

§1927.  "The burden of proving entitlement to attorney fees is on the party claiming such

entitlement." *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 2010 WL 4672357, at *7 (W.D.Pa.,

Nov. 9, 2010) (citations omitted).

### C.    Whether the Court May Consider Statements Made During Settlement Negotiations of the Underlying Claim.

As an initial matter, the Court must determine whether it may consider certain statements

made during the settlement negotiations of the underlying claim.  Plaintiffs contend that Federal

Rule of Evidence 408 prohibits evidence of settlement discussions for purposes of deciding

Defendant's Motion for Fees.  (Doc. No. 126, p. 10-14).  Plaintiffs specifically argue that the

settlement negotiations and the settlement brochure are not admissible.[3]  Plaintiffs also argue that

the statements are simply irrelevant, because any such statements occurred almost a year before

trial and prior to discovery being completed.  (Doc. No. 94, p. 6).

Defendant contends that the evidence at issue is offered for purposes *not* prohibited by

Federal Rule of Evidence 408.  (Doc. No. 124, p. 2).  Defendant points to the Advisory

Committee Notes on the 2006 amendments, which states that "Rule 408 is inapplicable if offered

to show that a party made fraudulent statements in order to settle a litigation."  (Doc. No. 124, p.

2-3).  Defendant also argues that the statements at issue were found in Plaintiffs' discovery

responses and at deposition, not just in the settlement context; therefore, counsel has waived any

potential privilege as to statements made in the context of settlement.  (Doc. No. 124, p. 5).

Federal Rule of Evidence 408 addresses the admissibility of evidence of prior settlement

negotiations.  It provides as follows:

---

[3] It is unclear exactly what aspect of the settlement negotiations are potentially at issue, as the parties focus specifically on the settlement brochure in the motion papers.  Thus, the Court will limit its consideration to the written statements in the settlement brochure.

8

> (a) Prohibited uses.--Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
>> (1) furnishing or offering or promising to furnish--or accepting or offering or promising to accept--a valuable consideration in compromising or attempting to compromise the claim; and
>> (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.
>
> (b) Permitted uses.--This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

Federal Rules of Evidence Rule 408.

"FRE 408 follows a policy favoring freely-negotiated settlements, by providing a neutral environment in which parties may negotiate a settlement to litigation without prejudicing their substantive rights.  Introducing details of settlement negotiations into the court record has a chilling effect on the parties' willingness to enter into settlement negotiations." *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F.Supp.2d 435, 440 (D.Del. 2007) (citations omitted).  However, the restriction of Rule 408 does *not* always apply.  "For example, evidence of fraudulent statements by a party made in order to settle litigation would be admissible." *Inline Connection Corp.*, 470 F.Supp.2d at 440 (citations omitted); *see also* Fed. R. Evid. 408 Advisory Committee's Note (2006).

9

As discussed more fully below, the settlement brochure relates Mr. Benson's hernia operation and bleeding to the injuries sustained from his ingestion of the screw.  In particular, the settlement brochure states that "prior to the [ingestion of the screw], Carver had a minor hernia which would require an elective repair [… and] after the incident, Carver began experiencing extreme internal bleeding, rectal bleeding, and urinating blood."  (Doc. No. 93, Ex. E, p. 2).  The brochure further states:

> under the guise of a hernia repair, Dr. Sooten [sic] performed surgery on Carver for no cost on January 22, 2007.  Because the surgery was free and done under the guise of a hernia repair, Dr. Sooten's [sic] records do not reflect evidence of the surgery that saved Carver's life.  However, Exhibit 'D' a photograph of Carver after the surgery, reflects a scar all the way up to Carver's chest and corroborates his position.

(Doc. No. 93, Ex. E, p. 2).  Defendant offers these statement show that Plaintiffs' counsel led Defendant to believe that Mr. Benson's injuries were severe enough to require surgery; Defendant contends that the facts do not support this claim.[4]

Plaintiffs argue that these statements in the settlement brochure are not admissible for the purposes of Defendant's motion.  (Doc. No. 126, p. 14).  Plaintiffs cite Rule 408, but fail to explain how the statements at issue are offered for a use prohibited by the Rule.  Rule 408 does not provide a blanket protection against any and all use of statements made during settlement negotiations.  The prohibited uses are those stated above; e.g., to establish liability, or the validity or amount of the claim.  *See Affiliated Mfrs., Inc. v. Aluminum Co. of America*, 56 F.3d 521, 526 (3d Cir. 1995).  Here, the statements during settlement are not being offered to prove liability for,

---

[4]  The parties do not argue that the settlement brochure is being offered to impeach through a prior inconsistent statement or contradiction.

invalidity of, or amount of the disputed claim.  Rather, the statements are offered in support of a fee petition, to demonstrate that Plaintiffs presented unsubstantiated claims as facts during the course of litigation in order to settle the litigation.  I disagree with Plaintiffs' contention that such a use is prohibited by Rule 408.

While Plaintiffs rely heavily on *Ciolli v. Iravani*, the case is distinguishable.  (Doc. No. 126, p. 10-14) (citing *Ciolli v. Iravani*, 625 F.Supp.2d. 276 (E.D.Pa. 2009)).  In *Ciolli*, the underlying litigation concerned harassing internet posts in which the plaintiff (Anthony Ciolli) was named a defendant.  In negotiating Mr. Ciolli's voluntary dismissal from the underlying litigation, the parties discussed the reasons behind naming Mr. Ciolli as a defendant and his participation in the alleged harassing internet posts.  Thus, these settlement discussions addressed Mr. Ciolli's liability for, and the validity of the plaintiffs' claims concerning, the alleged harassing internet posts.  Mr. Ciolli then attempted to include the substance of the settlement discussions in his subsequent claims for abuse of process and wrongful initiation of civil proceedings.  However, the District Court found that "there is no doubt that Plaintiff is seeking to use the content of these discussions to prove certain Defendants' liability for wrongful initiation of civil proceedings and abuse of process in the instant action."  *Ciolli*, 625 F.Supp.2d at 286. The District Court noted that "Ciolli is attempting to use evidence of settlement negotiations to prove the invalidity of the negotiated claims, albeit in support of his allegations in this case."  *Id*. at 288.  Thus, the statements were excluded.  Here, the underlying settlement discussions at issue involve purported statements of facts concerning Mr. Benson's injuries.  The statements are being offered as evidence of a fraudulent statement by a party in order to settle litigation; therefore, the Rule does not require exclusion of the evidence.  *Inline Connection Corp.*, 470

F.Supp.2d at 440; *see also* Fed. R. Evid. 408 Advisory Committee's Note (2006).

Additionally, I do not agree with Plaintiffs' contention that the statements are irrelevant. Defendant seeks an award of fees regarding counsel's conduct *throughout* the litigation, and statements made during the course of settlement are highly relevant.  Accordingly, the Court will consider the statements made in the settlement brochure for purposes of evaluating the request for an award of attorney's fees.[5]

### D.      Facts Relevant to the Three Allegedly Meritless Arguments.

As stated above, Defendant asserts that Plaintiffs' counsel unreasonably and vexatiously multiplied the proceedings by pursuing three meritless arguments.  Defendant argues that it is entitled to attorney fees and expenses for having to defend against these arguments.  The Court considers each argument in turn below.  The relevant facts concerning each of these three arguments are as follows.

In October of 2007, Dr. Jeffrey E. Sootin saw Carver Benson in the emergency room for evaluation of complaints of abdominal pain and incisional hernia.  (Doc. No. 93, Ex. B, at 12:12-17).  Upon examination, Dr. Sootin recorded the existence of a midline hernia, accompanied by a bulge above Mr. Benson's belly button.  (Doc. No. 93, Ex. B, at 13:9-15).  Dr. Sootin determined

---

[5] As Defendant correctly notes, the relevant statements in the settlement brochure were also made outside the context of settlement.  For example, Plaintiffs' discovery responses indicate that ingestion of the screw resulted in painful abdominal surgery (the hernia operation). (Doc. No. 93, Ex. G) (Def. Trial Ex. 4).  At his deposition, Mr. Benson testified that the large scar from his hernia surgery was the result of his physician having to fix his internal bleeding. (Doc. No. 9 3, Ex. F, 280:2-14).  Plaintiffs' discovery responses also state that Mr. Benson experienced rectal bleeding from ingesting the screw.  (Doc. No. 93, Ex. G) (Def. Trial Ex. 4). Thus, the claims made in Plaintiffs' settlement brochure were repeated throughout the litigation, so excluding similar statements from the settlement brochure would not significantly change the Court's analysis in any event.

that Mr. Benson's pain was a "chronic problem," and he discharged Mr. Benson in stable condition with instructions to follow up with an office visit "to plan elective repair." (Doc. No. 93, Ex. B, 15:9-17).

Mr. Benson consulted Dr. Sootin again on November 14, 2007, complaining of pain related to his hernia, as well as rectal bleeding. (Doc. No. 93, Ex. B, at 17:19 to 18:20). Dr. Sootin again recommended surgery to repair Mr. Benson's hernia, which was located on his abdominal wall. (Doc. No. 93, Ex. B, at 18:17). At that time, Dr. Sootin also recommended a "GI evaluation" concerning the rectal bleeding. (Doc. No. 93, Ex. B, at 18:10-20). Dr. Sootin's Progress Notes dated November 14, 2007, confirm his testimony that Mr. Benson reported rectal bleeding on that date and that Dr. Sootin recommended "GI eval for rectal bleeding." (Def.'s Trial Ex. 17).

One week later, on November 21, 2007, Mr. Benson purchased a rotisserie chicken from a Giant Store in Lansdowne, Pennsylvania, owned by Giant Food Stores, LLC ("Giant"). Unbeknownst to Mr. Benson, the chicken contained a metal screw, which he accidentally consumed. (Doc. No. 93, Ex. E, p. 2).

On November 27, 2007, Mr. Benson consulted Dr. Sootin again, explaining that he had ingested and passed a screw, and that his pain persisted. (Doc. No. 93, Ex. B, at 20:6-11). Mr. Benson claims that he expressed concern that the ingestion of the screw may have aggravated his hernia and rectal bleeding, but Dr. Sootin does not recall any such complaint. (Doc. No. 93, Ex. B, at 24:5-17). After examining Mr. Benson, Dr. Sootin determined that his hernia remained unchanged. (Doc. No. 93, Ex. B, at 23:11-23). At this time, Dr. Sootin testified that he "again referred [Mr. Benson] to GI so we could repair his hernia." (Doc. No. 93, Ex. B, at 20:10-11).

Dr. Sootin testified that he would not routinely require a GI evaluation prior to surgery to repair a hernia, but he recommended the evaluation for Mr. Benson due to his complaints of rectal bleeding. (Doc. No. 93, Ex. B, at 21:22 - 22:9). Dr. Sootin's Progress Notes dated November 27, 2007, confirm his testimony that he recommended "GI eval > then repair." (Def.'s Trial Ex. 17).

On January 22, 2008, Dr. Sootin performed incisional repair surgery on Mr. Benson. (Doc. No. 93, Ex. B, at 31:1-2). Dr. Sootin's records and all other documentation from the surgery fail to mention any damage caused by the ingested screw. (Doc. No. 93, Ex. C). Notwithstanding this, Mr. Benson believed that the hernia surgery was "rush[ed]" in order to address the internal bleeding. (Doc. No. 93, Ex. F, at 283:2-15). Plaintiffs' Complaint alleges "disruption" of the scheduled hernia operation due to ingestion of the screw. (Doc. No. 1, ¶ 17).

On or about January 24, 2008, Mr. Benson's attorney, Gene A. Foehl ("Attorney Foehl"), received Dr. Sootin's operative report. (Doc. No. 93, Ex. D). On January 28, 2008, Attorney Foehl wrote a letter to Dr. Sootin, inquiring as to whether the "incisional hernia you have in your report was in any way related to [the ingestion of the screw], or if any of the other medical treatment that you provided was so related." (Doc. No. 93, Ex. D). A copy of the January 28, 2008, letter, which appears to have been produced as part of the medical records received from Dr. Sootin, includes a handwritten note stating "per Dr. Sootin not related. GS." (Doc. No. 93, Ex. D).[6] At some point in time following the written inquiry from Attorney Foehl, Dr. Sootin

_____

[6] The origin and date of the handwritten note has not been fully confirmed, but it appears that the note reflects information relayed by Dr. Sootin to his manager Glenda Smith. (Doc. No. 124, p. 6, fn 1) (Doc. No. 93, Ex. B, at 35:5-12). Dr. Sootin testified that he provided the information in the note to his office manager, but later spoke with Mr. Foehl regarding the same. (Doc. No. 93, Ex. B, at 35:5-12).

spoke to Attorney Foehl by telephone, and informed him that the ingestion of the screw was not related to the hernia operation or to any of his treatment of Mr. Benson.  (Doc. No. 93, Ex. B, at 34:16 to 36:11).  Attorney Foehl avers that his conversation with Dr. Sootin took place two years later, on February 25, 2010.  (Doc. No. 126, p. 2).  No evidence has been presented to contradict Attorney Foehl's representations on this point.

Mr. Benson testified that following these medical issues, he was unable to go back to work due to bleeding, and he lost his job as a result of his absence.  (Doc. No. 53, ¶ 7 and Ex. B, p. 17-19).  Mr. Benson testified that his wife, who had worked outside the home as a caregiver, stopped doing so, in order to stay home and assist Mr. Benson with his medical needs.  (Doc. No. 53, Ex. B, p. 17-19).  On October 7, 2008, Mr. Benson's family home located at 3350 Centerville Rosebud Road, where Plaintiffs had been residing, was lost to foreclosure.  Plaintiffs claim that this was due to the family's loss of income.[7]  (Doc. No. 53, Ex. A) (Doc. No. 53, Ex. B, p. 18-19) (Doc. No. 93, Ex. E).

Thus, on July 9, 2009, Plaintiffs filed the present action, alleging that ingesting the screw caused "bleeding of the mouth, rectum, and other portions of his body, an injured tooth, a piece of metal becoming imbedded in his jaw, disruption of a scheduled hernia surgery, difficulty breathing, soreness, internal aches and pain, lacerations of the palate, gums, esophagus and lining of the stomach and intestines and other associated injuries and expenses."  (Doc. No. 1, ¶ 17).

At his deposition on November 12, 2009, Mr. Benson answered questions from his attorney concerning Mr. Benson's conversations with Dr. Sootin.  (Doc. No. 93, Ex. F, 275-283).

---

[7]  In 2006, *prior* to these medical issues, Plaintiffs filed for bankruptcy.  (Doc. No. 93, Ex. L).  The 2006 bankruptcy case was dismissed without prejudice on March 26, 2007.  (Doc. No. 93, Ex. L).

Mr. Benson testified that Dr. Sootin had scheduled him for "walk-in surgery," but Dr. Sootin

wanted him to "go in right away" following ingestion of the screw.  (Doc. No. 93, Ex. F, 278:19-

22).  Plaintiffs' counsel also elicited testimony from Mr. Benson concerning the incision and scar

from the surgery performed by Dr. Sootin, which Mr. Benson explained was the result of having

to fix the internal bleeding.  (Doc. No. 9 3, Ex. F, 280:2-14).  Mr. Benson also testified that he

lost his job as a truck driver due to his injuries, and that he had to sell two vehicles to pay bills

after he lost his job.  (Def. Trial Ex. 13, at 253:12 - 254:5).  Mr. Benson also testified that he lost

his home at 3350 Centerville Rosebud Road after the incident.  (Doc. No. 53, ¶ 7 and Ex. B, p.

17-19) (Def. Trial Ex. 13, at 253:12 - 254:5, 268:7 - 269:24).

On November 17, 2009, Plaintiffs submitted discovery responses concerning bills,

expenses, pain, ailments, and complaints resulting from ingestion of the screw.  (Doc. No. 93,

Ex. G) (Def. Trial Ex. 4).  The relevant interrogatories are as follows:

> 61.  If you have incurred any bills or expenses in connection with
> the injuries or diseases which you have suffered because of the
> accident referred to in the Complaint, and such bills or expenses
> are not otherwise listed in answer to these Interrogatories, set forth
> the amount of each such bill or expense, the service for which the
> bill or expenses was incurred, and the identity of the person who
> rendered the bill or who was involved in the expense.
>
> **ANSWER**
> See produced medical records.  By way of further response,
> Plaintiff underwent a hernia surgery on or about January 22, 2008.
> Although the medical records do not reflect it, Plaintiff believes
> Dr. Sootin also repaired abdominal bleeding caused by the injury
> during the hernia surgery.  Plaintiff spent approximately six (6)
> days in the hospital after the surgery.  Plaintiff reserves the right to
> supplement this response, as discovery is still ongoing.
>
> 62.  Describe any pain, ailment, Complaint, injury or disability that
> you presently have as a result of the incident here involved.

16

**ANSWER**
Carver Benson -
- Physical pain of biting into the screw
- Bleeding from the mouth and choking when the screw was consumed
- Uncertainty and anxiety while the screw was inside his body
- Physical pain and suffering caused by the abdominal surgery performed by Dr. Sootin on January 22, 2008
- Physical pain that persists to this day in his stomach area
- Rectal bleeding
- Loss of his job with JR Trucking
- Loss of the house located at 3350 Centerville Rosebud Road, Snellville, GA 30039
- Loss of certain cars that were sold in order to make a payment on the house
- Experiencing blood in his stool and the anxiety therefrom
- Loss of time with his family, including missing his daughter's 11th grade year
- Pain from knowing his son in college has nowhere to go when he comes home from college
- Humiliation of no longer owning his home
- Time spent re-building . . . his life with his family
- Loss of time spent with friends
- Loss of time spent with pets
- Loss of sexual relationship with Annie from November 21, 2007 until June / July 2008
- Loss of time spent with Annie and the family
- Inability to help out around the house
- Loss of other aspects in his daily life
. . . .

(Doc. No. 93, Ex. G) (Def. Trial Ex. 4).

When Judge Sánchez referred this matter for a settlement conference, this Court directed

the parties to prepare and submit confidential settlement conference memoranda. (Doc. No. 7).

In response, on November 11, 2009, Plaintiffs faxed the Court an "updated settlement brochure"

("settlement brochure"), a copy of which Defendant received on November 12, 2009.  (Doc. No.

93, Ex. E).  Plaintiffs' settlement brochure alleges that "prior to the [ingestion of the screw],

Carver had a minor hernia which would require an elective repair [… and] after the incident,

Carver began experiencing extreme internal bleeding, rectal bleeding, and urinating blood."

(Doc. No. 93, Ex. E, p. 2).  The Brochure further states that:

> under the guise of a hernia repair, Dr. Sooten [sic] performed
> surgery on Carver for no cost on January 22, 2007.  Because the
> surgery was free and done under the guise of a hernia repair, Dr.
> Sooten's [sic] records do not reflect evidence of the surgery that
> saved Carver's life.  However, Exhibit 'D' a photograph of Carver
> after the surgery, reflects a scar all the way up to Carver's chest
> and corroborates his position.

(Doc. No. 93, Ex. E, p. 2).  The Brochure indicates that Mr. Benson's physical pain and suffering

included urinating blood.  (Doc. No. 93, Ex. E, p. 4).

Plaintiffs' Pretrial Statement, filed on March 26, 2010, also reports that Mr. Benson's

pain and suffering include urinating blood.  (Doc. No. 21, p. 3).  Plaintiffs further report that Mr.

Benson's internal bleeding subsided following surgery; however, he continues to urinate blood.

(Doc. No. 21, p. 3).

On March 26, 2010, Plaintiffs submitted the expert report of Victor W. Groisser, M.D.

(Doc. No. 126, p. 5).  Dr. Groisser reviewed Mr. Benson's medical records and deposition

transcript and issued a report stating:

> Mr. Benson[,] in response to questions by the plaintiff's attorney[,]
> stated that he thought that Dr. Sootin would control his GI bleeding
> as well as take care of his hernia.  Dr. Sootin operated on his hernia
> and there is no reference in his notes to a problem of GI bleeding
> nor that he fixed anything related to GI bleeding.  Apparently, the
> patient stopped bleeding at that time or it slowed down so that he
> felt that Dr. Sootin did something specific but that was not the
> case.

*See* Dr. Groisser's expert report at 3.[8]  In discussing the emergency room records from the day of the incident, Dr. Groisser reports that upon discharge from the emergency room Mr. Benson "was still hurting, he was having internal bleeding . . . the patient stated that he never had rectal bleeding before." *Id.* at 2.  Dr. Groisser opined that Mr. Benson's rectal bleeding was hemorrhoidal in nature, but also could have come from some superficial trauma of the tissue in the distal colon. *Id.* at 4.

At arbitration on May 13, 2010, Plaintiffs's counsel questioned Mr. Benson about the surgery performed by Dr. Sootin.  Mr. Benson testified that the surgery performed by Dr. Sootin "solved most of the problems that [he] had for [the internal] bleeding."  (Doc. No. 93, Ex. H, 36:4 - 37:4).  Plaintiffs' counsel reviewed Mr. Benson's testimony, asking "[s]o you thought that [Dr. Sootin] had addressed the screw problems as well?"  (Doc. No. 93, Ex. H, 37:2-3).  Mr. Benson responded, "[y]es, sir."  (Doc. No. 93, Ex. H, 37:4).  Following an objection that counsel was leading the witness, which was overruled by the Chairman, Plaintiffs' counsel again asked:

> Q: So your feeling at that time that because the bleeding stopped,
> that you thought that Dr. Sootin did something to help you
> regarding the screw?
> A: Yes, sir.
> Q: In addition to doing the incisional hernia?
> A: Yes.

(Doc. No. 93, Ex. H, 37:13-21).

On August 6, 2010, Dr. Groisser testified that Dr. Sootin "did nothing related to the screw."  (Doc. No. 93, Ex. I, at 30:20-23).  However, Dr. Groisser also testified that "Mr. Benson

---

[8]  Dr. Groisser's expert report was not attached to the motion papers; however, Plaintiffs' submission titled "Plaintiffs Exhibits Relating to Defendants' Motion for Counsel Fees and Expenses," which does not appear to have been docketed, contains the relevant excerpts cited above.

knew that Dr. Sootin was going to correct his abdominal hernia and he thought that as a secret

between them he would also correct his problem of bleeding which by then had tapered

considerably."  (Doc. No. 93, Ex. I, at 33:11-19).  When asked whether Mr. Benson still held that

belief *after* the operation, Dr. Groisser responded, "Yeah.  He felt Dr. Sootin took care of the

bleeding problem as well as the hernia."  (Doc. No. 93, Ex. I, at 33:20-24).  Finally, Dr. Groisser

opined that Mr. Benson's rectal bleeding in the weeks after the screw had passed was secondary

to the trauma from the screw passing through the hemorrhoidal area.  (Dr. Groisser Depo., at

34:18 - 35:1).[9]

     **E.**     **Whether the Allegedly Meritless Arguments Warrant Attorney Fees.**

     **(1)**     **Plaintiffs' argument that Dr. Jeffrey E. Sootin's hernia operation and treatment of Mr. Benson was related to the ingestion of the screw was not made in bad faith and does not warrant attorney fees.**

Defendant alleges that Plaintiffs "multiplied the proceedings in this case unreasonably

and vexatiously" by arguing that the hernia operation performed by Dr. Jeffrey E. Sootin, and the

treatment of Mr. Benson was related to the ingestion of the screw.  Defendant complains that

Plaintiffs' actions forced Defendant to prepare and file a Motion in Limine to Preclude Plaintiffs

from Testifying to Medical Opinions at trial, since Attorney Foehl and Attorney Rushie

continually elicited testimony from Mr. Benson about how the hernia operation and his treatment

were related to the ingestion of the screw.  Defendant also claims numerous additional expenses,

including the preparation of pleadings, discovery material, expert testimony to refute meritless

--------------------------------------------------

    [9] The full text of Dr. Groisser's trial deposition transcript was not attached to the motion papers; however, Plaintiffs' submission titled "Plaintiffs Exhibits Relating to Defendants' Motion for Counsel Fees and Expenses," which does not appear to have been docketed, contains the relevant excerpts cited above.

arguments, motions at trial, and post-trial motion practice.  Defendant also claims that counsel acted in bad faith because counsel pursued this issue without supporting medical records.

 Defendant argues that the element of bad faith is met "when an attorney intentionally advances a baseless contention for an ulterior purpose such as harassment or delay."  (Doc. No. 93, p. 25) (*citing Ford*, 790 F.2d at 347).  Defendant has not provided evidence of an "ulterior purpose," but argues that such a purpose may be "inferred when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose."  (Doc. No. 124, p. 7) (*citing Alphonso v. Pitney Bowes, Inc.*, 356 F.Supp. 2d 442, 452 (D.N.J. 2005)).  Defendant argues that the improper purpose was to secure a large settlement.

Plaintiffs' counsel avers that the relation between ingesting the screw and the hernia surgery was not set forth in the Complaint, nor presented at arbitration or at trial, because counsel was investigating the issue.  (Doc. No. 126, p. 4-6).  Plaintiffs also emphasize that bad faith must be shown before sanctions may be imposed.  Plaintiffs argue that counsel at all times acted in good faith and based on the information available.

As set forth above, to violate § 1927, an attorney must be found to have: "(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct."  *In re Schaefer Salt Recovery, Inc.*, 542 F.3d at 101.  The Third Circuit has held that "sanctions may not be imposed under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal."  *Grider*, 580 F.3d at 142.  "The burden of proving entitlement to attorney fees is on the party claiming such entitlement."

*Zambelli Fireworks Mfg. Co., Inc.*, 2010 WL 4672357, at *7.

Based on all of the information now available, the Court is not convinced that counsel for Plaintiffs acted in bad faith in this case. First, it was reasonable and appropriate for Plaintiffs' counsel to identify and develop all potential claims resulting from the client's injuries. Here, Mr. Benson told his attorney that the hernia surgery was related to the screw, and Mr. Benson *believed* this to be the case. Mr. Benson pointed to his large abdominal scar in support of his belief. While counsel's investigation of this claim was not particularly efficient,[10] it was ultimately resolved by counsel prior to trial.[11] There is simply insufficient evidence that counsel purposely delayed or acted in bad faith regarding this issue.

The Court further finds that counsel justifiably explored the alleged disruption of Mr. Benson's scheduled hernia surgery, which is what the Complaint actually alleges. As stated above, Mr. Benson believed that Dr. Sootin "rushed" the hernia surgery in order to address his

---

[10] Immediately following the hernia surgery, Plaintiffs' counsel received some of Dr. Sootin's medical records. Upon receipt of Dr. Sootin's records in early 2008, counsel requested clarification regarding the scope of the hernia surgery. Specifically, Attorney Foehl asked Dr. Sootin whether the "incisional hernia you have in your report was in any way related to [the ingestion of the screw], or if any of the other medical treatment that you provided was so related." (Doc. No. 93, Ex. D). However, counsel contends that he did not get an answer to this question until he spoke with Dr. Sootin nearly two years later, on February 25, 2010. (Doc. No. 126, p. 2). Thus, counsel was aware of the outstanding issue during the two year period, but never got clarification from Dr. Sootin during that time period. It is unknown why counsel failed to resolve the issue until February 2010. Nevertheless, there is no evidence that the issue became clear to Attorney Foehl at an earlier time, and there is no evidence that the delay was motivated by bad faith, or was an act of intentional misconduct. In fact, on March 1, 2010, Mr. Foehl wrote to Dr. Sootin's office to request medical records that had been previously requested, but never received. (Doc. No. 126, at 18). Counsel's letter expresses surprise and disappointment in not having previously received the requested medical records.

[11] Defendant acknowledges that Mr. Benson's unfounded belief was never presented to the jury. (Doc. No. 124, p. 9).

22

internal and rectal bleeding caused by ingesting the screw.  It was reasonable for counsel to plead

disruption of the scheduled hernia given the information provided by his client and the medical

records available at the time the Complaint was filed.  Even though Mr. Benson's belief turned

out to be unfounded,[12] counsel was obligated to explore the matter.

Counsel also needed to determine whether the scheduled hernia was delayed in order for

Mr. Benson to be evaluated by a GI physician.  The medical records confirm that Dr. Sootin

recommended that a GI evaluation take place prior to the hernia surgery due to Mr. Benson's

rectal bleeding.  Dr. Sootin further testified that he does not routinely require a GI evaluation

prior to hernia surgery, but that he did so in Mr. Benson's case because of his rectal bleeding.

However, the Court observes that there appears to be some conflicting information in the medical

records concerning the timing and cause of Mr. Benson's rectal bleeding.  While Dr. Sootin's

notes and testimony clearly document complaints of rectal bleeding *prior* to the ingestion of the

screw, Mr. Benson apparently denied any such early bleeding to other physicians.  *See* Dr.

Groisser's expert report at 2 (Mr. Benson told emergency room physicians that he "never had

rectal bleeding before [swallowing the screw]").  Mr. Benson's wife also testified Mr. Benson

did not have rectal bleeding prior to the incident.  (Def. Trial Ex. 14, 30:18 - 31:3).  Indeed, the

March 26, 2010, expert report from Dr. Groisser states that Mr. Benson never had rectal bleeding

---

[12]  As confirmed by Dr. Sootin, the recommendation for a GI evaluation was based on Mr. Benson's complaints of rectal bleeding, which existed prior to ingesting the screw.  Likewise, Dr. Sootin recommended elective hernia repair prior to the ingestion of the screw, and that recommendation remained unchanged thereafter.  Thus, the hernia surgery was neither "rushed" to address internal bleeding from the screw, nor delayed for a GI evaluation of the screw injury. Both matters (the need for elective hernia repair and the GI referral) occurred *before* Mr. Benson ingested the screw.  While Plaintiffs may have believed that the matters were connected, Dr. Sootin's notes and testimony contradict that belief.

23

prior to ingesting the screw.  *See* Dr. Groisser's expert report at 2-3.  As noted above, Plaintiffs's counsel apparently did not receive *all* of Dr. Sootin's notes until a second request was made on March 1, 2010.  (Doc. No. 126, p. 2).  Thus, counsel did not have had the facts necessary for a full evaluation of this claim early in the litigation, and counsel's pleading and investigation of the issue was not in bad faith.  Again, there is insufficient evidence of intentional delay or improper purpose regarding the allegation of disruption in the scheduled hernia.

Additionally, the discovery responses, when read as a whole,[13] sufficiently disclose the fact that *Mr. Benson* believed the screw and the surgery were related.  Likewise, the settlement brochure and the expert report fully disclose the fact that the medical records do not support Mr. Benson's personal belief concerning the hernia surgery.  There is no allegation that Plaintiffs failed to turn over evidence that would undermine their claim.[14]  It may be true that Plaintiffs elicited testimony that Mr. Benson believed the hernia surgery and the screw ingestion were related, but the transcripts do not establish that counsel purposefully elicited false testimony from Mr. Benson.  Rather, the transcripts document what Mr. Benson "thought" was done during the hernia surgery.

In sum, I cannot conclude that counsel for Plaintiffs acted in bad faith with respect to the argument that Mr. Benson's hernia surgery was related to the screw.  Taking into account all of the relevant facts and information, I do not find that there has been a serious and studied

---

[13]  Plaintiffs' Answer to Interrogatory No. 61 appropriately indicates the lack of factual support for Mr. Benson's own belief that Dr. Sootin repair internal bleeding caused by ingesting the screw.

[14]  Indeed, Defendant acknowledges that Plaintiffs "continuously submitted documents stating that there were no medical records supporting their position that the ingestion of the screw was related to Dr. Sootin's hernia surgery and treatment of Mr. Benson."  (Doc. No. 93, p. 23).

24

disregard for the orderly process of justice.  *Ford*, 790 F.2d at 347.  I cannot conclude that counsel intentionally advanced a baseless contention for an improper purpose.  By all accounts, Mr. Benson truly believed that the hernia surgery was related to his ingestion of the screw, and counsel acted in good faith in exploring the issues and presenting the relevant evidence as available.  To be sure, it certainly would have been desirable for Mr. Foehl to have been more diligent in conducting certain discovery.  Notwithstanding this, I cannot conclude on the record before me that counsel acted in bad faith, violative of the recognized standards in the conduct of litigation.  *Baker*, 764 F.2d at 208.  Therefore, Defendant's request for sanctions arising out of this issue is denied.  Given the lack of bad faith, the Court will not address the remaining three elements necessary to award the requested attorney fees.

> **(2)** **Plaintiffs' argument that Mr. Benson suffered internal bleeding and rectal bleeding as a result of the ingestion of the screw was not made in bad faith and does not warrant attorney fees.**

Defendant next alleges that Plaintiffs "multiplied the proceedings in this case unreasonably and vexatiously" by arguing that Mr. Benson suffered internal bleeding and rectal bleeding as a result of the ingestion of the screw.  Defendant argues that Plaintiffs had no medical support for the argument that Mr. Benson suffered bleeding as a result of ingesting the screw.  Plaintiffs argue that the testimony at trial supported their position that passage of the screw caused rectal bleeding.  Specifically, Plaintiffs contend that the screw excoriated Mr. Benson's preexisting hemorrhoidal tissue causing bleeding.  Having considered the respective positions of both parties and having fully considered all of the facts and evidence cited by the parties, the Court cannot conclude that counsel for Plaintiffs acted in bad faith or with intentional misconduct on this issue.

25

As set forth above, Dr. Groisser's expert report indicates that Mr. Benson's rectal bleeding was hemorrhoidal in nature, but also could have come from some superficial trauma of the tissue in the distal colon.  *See* Dr. Groisser's expert report at 4.  At his deposition, Dr. Groisser unequivocally opined that the passage of the screw caused rectal bleeding.  (Dr. Groisser Dep., at 34:18 - 35:1).  Dr. Groisser based his opinion on various medical records and Mr. Benson's deposition testimony.  There is some indication in the record that Mr. Benson may not have provided accurate information concerning the nature or timing of his rectal bleeding;[15] however, counsel reasonably relied on Dr. Groisser's professional opinion.  There is nothing to suggest that counsel for Plaintiffs manufactured or influenced Dr. Groisser's opinion for the purposes of inflating Mr. Benson's injuries.  In short, the record shows that Mr. Benson claimed increased rectal bleeding from passage of the screw; Plaintiffs' expert offered an opinion confirming the injury; and counsel presented the claim at trial.  Given the medical record and the expert opinion, I cannot conclude that counsel acted in bad faith violative of the recognized standards in the conduct of litigation.  *Baker*, 764 F.2d at 208.  While there may be a discrepancy in nature or timing of the bleeding, this discrepancy, standing alone, does not rise to the level of bad faith sufficient to justify the award of sanctions.  I do not find that there has been a serious

---

[15]  The Court notes that Dr. Sootin recorded Mr. Benson's complaints of rectal bleeding *prior* to Mr. Benson ingesting the screw.  However, it is not clear when this information was available to counsel (and therefore Dr. Groisser).  Plaintiffs' counsel did not receive a complete set of Dr. Sootin's notes until after counsel spoke with Dr. Sootin on February 25, 2010.  (Doc. No. 126, p. 2).  Additionally, Dr. Groisser's report specifically states that Dr. Sootin's notes do not contain any information as to GI bleeding and that "[Mr. Benson] never had rectal bleeding before [swallowing the screw]."  Dr. Groisser's expert report at 2-3.  Thus, there is certainly some confusion as to when Mr. Benson first experienced rectal bleeding.  In any event, Plaintiffs' claim as to rectal bleeding is not grounded on a statement that Mr. Benson never had *any* prior rectal bleeding.  Rather, Plaintiffs complained of extreme internal bleeding and rectal bleeding following the incident.

and studied disregard for the orderly process of justice. *Ford*, 790 F.2d at 347. Therefore, Defendant's request for sanctions arising out of this issue is denied.

> **(3)      Plaintiffs' argument that their financial hardship was a direct result of the ingestion of the screw was not made in bad faith and does not warrant attorney fees.**

Defendant next alleges that Plaintiffs "multiplied the proceedings in this case unreasonably and vexatiously" by arguing that Plaintiffs' financial hardship was a direct result of the ingestion of the screw. Defendant argues that Plaintiffs had no evidentiary support for their assertion that the Benson's financial hardships, including the loss of their home, cars, and employment, was directly caused by ingestion of the screw. (Doc. No. 93). However, Plaintiffs contend that the evidence supports their claim of financial hardship caused by Mr. Benson's injuries. Specifically, Plaintiffs argue that Mr. Benson was unable to drive his truck due to significant rectal bleeding caused by passage of the screw, and lost his job as a result. Plaintiffs explain that the loss of Mr. Benson's employment necessitated the sale of his vehicles to fund mortgage payments on the family home, the latter of which was ultimately lost to foreclosure. (Doc. No. 126). Having considered the respective positions of both parties and having fully reviewed the record, the Court cannot conclude that counsel for Plaintiffs acted in bad faith or with intentional misconduct as to this third argument.

As set forth above, Plaintiffs' discovery responses state that Mr. Benson's injury resulted in the loss of his job with JR Trucking, the loss of the house located at 3350 Centerville Rosebud Road, and the loss of certain cars that were sold in order to make a payment on the house. (Doc. No. 93, Ex. G) (Def. Trial Ex. 4). Plaintiffs presented evidence that these losses occurred after Mr. Benson's injury. At his deposition, Mr. Benson testified consistent with the discovery

responses.  Mr. Benson testified that he was unable to go back to work due to bleeding, and he

lost his job.  Mr. Benson testified that he sold two vehicles, a 1998 Dodge pick-up truck and a

2003 Nissan Maxima, to pay bills after he lost his job.  (Doc. No. 93, Ex. L) (Def. Trial Ex. 13, at

253:12 - 254:5).  Mr. Benson also testified that he lost his home at 3350 Centerville Rosebud

Road after the incident.  (Doc. No. 53, ¶ 7 and Ex. B, p. 17-19) (Def. Trial Ex. 13, at 253:12 -

254:5, 268:7 - 269:24).  This testimony concerning Mr. Benson's inability to perform his job and

related losses is uncontradicted by other evidence of record.[16]  The record also provides

independent support for Plaintiffs' contention regarding the loss of the family home located at

3350 Centerville Rosebud Road.  (Doc. No. 53, Ex. A) (Doc. No. 53, Ex. B, p. 18-19) (Doc. No.

93, Ex. E).

      Defendant also asks the Court to consider the fact that Plaintiffs experienced financial

hardship prior to the screw incident, as evidenced by the fact that Plaintiffs filed a Chapter 13

bankruptcy action in September 2006.  (Doc. No. 93).  Defendant argues Mr. Benson's job loss

from his personal injuries in November 2007 could not have caused the alleged financial

hardship.  However, I do not agree.  The record shows that the 2006 bankruptcy filing was

resolved by an order of dismissal one month *prior* to Mr. Benson's injury.  (Doc. No. 126).

Therefore, Plaintiffs were no longer involved in the previously filed bankruptcy during the period

of alleged financial hardship, and the prior bankruptcy was dismissed without a confirmed

bankruptcy plan.  (Doc. No. 93, Ex. L).  Additionally, the home and vehicles involved in the

---

[16] Defendant asks the Court to consider the fact that Mr. Benson resigned from his
trucking job.  (Doc. No. 127, p. 7).  However, the fact remains that Mr. Benson testified that he
was unable to work as a result of the injury and that he stopped working immediately following
the injury.  Whether Mr. Benson resigned or was fired is not dispositive.

2006 bankruptcy were different from the claimed losses resulting from the injury.[17]  Even if Mr. Benson did not sell two vehicles as he testified to, I do not find that the matter, standing alone, multiplied the proceedings in this case.  I cannot conclude that Attorney Foehl's conduct as it relates to this claimed item of damages amounts to bad faith sufficient to warrant the imposition of fees.

Moreover, Plaintiffs did not need to be in a fully secure and comfortable financial condition prior to the injury in order to claim financial strain as a result of the injury.  Mr. Benson claimed that he was unable to perform his job as a truck driver immediately following the incident and that he was unable to find suitable employment thereafter.  Any such lack of employment could certainly be expected to cause the type of financial strain claimed by Plaintiffs in the litigation.  The jury apparently disbelieved this contention, but this does not necessarily mean that Attorney Foehl acted in bad faith in presenting the claim to the jury.

Mr. Benson and his wife both testified that the Benson's lost their home, employment, and motor vehicles due to Mr. Benson's injuries. (Def. Trial Exs. 13, 14).  Given the record before me, I cannot conclude that counsel acted in bad faith violative of the recognized standards in the conduct of litigation in pursuing damages for these claims.  *Baker*, 764 F.2d at 208. Therefore, Defendant's request for sanctions arising out of this issue is denied.

---

[17]  On October 7, 2008, the family home located at 3350 Centerville Rosebud Road was lost due to foreclosure.  (Doc. No. 53, Ex. A) (Doc. No. 53, Ex. B, p. 18-19) (Doc. No. 93, Ex. E).  The property involved in the bankruptcy was a separate adjacent landlot located at 3348 Centerville Rosebud Drive.  (Doc. No. 93, Ex. L).  Likewise, the vehicle involved in the bankruptcy was a 1998 Cadillac Deville, while the vehicles sold to make mortgage payments were a 1998 Dodge pick-up truck and a 2003 Nissan Maxima.  (Doc. No. 93, Ex. L) (Def. Trial Ex. 13, at 253:12 - 254:5).

### III.    CONCLUSION:  ADDITIONAL FEES REQUESTED

In addition to the attorney fees and costs associated with work performed prior to final judgment, Defendant seeks sanctions concerning the post-trial motions filed by Plaintiffs. Defendant asserts that Plaintiffs' Motion for a New Trial, Plaintiffs' Motion for Reconsideration, and Plaintiffs' request for Rule 11 sanctions were improper and warrant an award of fees and costs.  (Doc. No. 93, p. 22, 25) (Doc. No. 100).

This Court previously determined that the record did not justify the imposition of attorney fees in relation to Plaintiffs' Motion for a New Trial.  (Doc. No. 106).   In this sense, Defendant seeks reconsideration of the prior order.  In that prior order, this Court noted:

> To violate § 1927, an attorney must be found to have: '(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct.' *In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 101 (3d Cir.2008).  The Third Circuit has held that 'sanctions may not be imposed under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal.' *Grider v. Keystone Health Plan Central, Inc.*, 580 F.3d 119, 142 (3d Cir.2009)  Under § 1927, an attorney's conduct 'must be of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation.' *Id*.  Plaintiffs' post-trial motion practice falls short of this high threshold.

(Doc. No. 106).  Defendant presents no new argument addressing this prior determination as it relates to Plaintiffs' Motion for a New Trial.  Therefore, the request for fees related to Plaintiffs' Motion for a New Trial will be denied.

Defendant's request for attorney fees for responding to Plaintiffs' Motion for Reconsideration will also be denied.  Plaintiffs' Motion for Reconsideration was denied as untimely, because it was filed two weeks late.  (Doc. No. 103).  Defendant requests attorney fees

for preparation of its Motion to Strike the untimely motion.  (Doc. No. 100, at 6-9).  Given the

significant arguments presented by Plaintiffs' Motion for Reconsideration and the existence of

other pending post-trial motions, Plaintiffs' relatively short delay in filing the motion does not

rise to the level of bad faith sufficient to warrant an award of attorney fees.

Finally, Defendant's request for fees relating to Plaintiffs' request for Rule 11 sanctions

will be denied.  Given Defendant's position that Plaintiffs failed to properly file a Rule 11

motion in the first instance, which is discussed below, a more efficient resolution of the matter

would involve a simple communication with opposing counsel or the Court to resolve the matter.

Thus, the Court declines to award any fees associated with Plaintiffs' request for fees.

To the extent Plaintiffs request attorney fees pursuant to Federal Rule of Civil Procedure

11, such request will be denied.  As Defendant points out, any such request must be made by

motion "separately from any other motion and must describe the specific conduct that allegedly

violates Rule 11(b)," which Plaintiffs failed to do.[18]   *See* Fed.R.Civ.Pro. 11(c).  Moreover,

Plaintiffs have not otherwise adequately demonstrated that they are entitled to Rule 11 sanctions.

Plaintiffs have made only the most general statement that Defendant should be sanctioned for

filing the Motion for Attorney Fees because Defendant presented no credible argument and

Plaintiffs' claims at trial were supported by the evidence.  (Doc. No. 94, p. 6-8) (Doc. No. 126).

I conclude that Plaintiffs' position in this regard is without merit, and deny Plaintiffs' request for

attorney's fees.[19]

_____

[18]  Plaintiffs do not present any argument responding to the issue of the procedural
requirements for bringing a Rule 11 motion.

[19]  Defendant did, in fact, present credible arguments in support of the Motion for
Attorney Fees.  As discussed above, Defendant presented evidence to support its claim that

An appropriate Order follows.

BY THE COURT:


 /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE

---

Plaintiffs knew, or should have known, that certain positions advanced during litigation were contradicted by the facts.  Defendant also explained why it believes Plaintiffs pursued these arguments in bad faith.  Thus, Defendant presented credible arguments in support of the Motion for Fees.